GARRELT WEHMER ET AL., APPELLEES, V. WILM JANNSEN
FOKENGA ET AL., APPELLANTS.

FILED JANUARY 19, 1899.    No. 8589.

1. **Religious Societies:** CHURCH POLITY: JURISDICTION OF COURT. Whether the tenets of faith, the practice, and church polity of one synod of the German "Evangelical Lutheran church in the United States" differ in essential particulars from the tenets of faith, the practice, and church polity of another synod of such church is purely a question of ecclesiastical law, and not one that the secular courts will assume jurisdiction to investigate and determine as an original question.

2. ———: ———: ECCLESIASTICAL TRIBUNALS: EFFECT OF DECISIONS. When the ecclesiastical tribunals of the church have determined such question, their judgment will be recognized by the secular courts as final and conclusive when the latter are called upon by contending factions of a congregation to determine their rights as members of such church.

3. ———: ———: INJUNCTION: EMPLOYMENT OF PASTOR. A majority of a religious congregation, or the trustees thereof, will not, at the suit of a minority of such congregation, be enjoined from employing as pastor for the congregation a minister, professing and teaching the same organic creed professed by the congregation, on the ground that such minister teaches certain doctrines and practices a certain church polity not taught and practiced by the minority nor by the original founders of the congregation.

4. ———: ———: ECCLESIASTICAL TRIBUNALS: ENFORCEMENT OF DECISIONS. In such a case the minority must appeal to the supervising tribunals of the church, and their judgment the secular courts will take as final in the premises and, if necessary and proper, enforce.

5. **Injunction:** REMEDY AT LAW: POSSESSION OF REALTY. A litigant cannot successfully invoke the extraordinary remedy of injunction to regain possession of real estate wrongfully in the possession of another, in the absence of a showing that the ordinary remedies of the law will not afford him complete and adequate relief.

APPEAL from the district court of Johnson county. Heard below before BABCOCK, J. *Reversed.*

*F. A. Boehmer, Nestor Rummons,* and *J. Hall Hitchcock,* for appellants.

*Hugh La Master* and *Clarence Gillespie, contra.*

Wehmer v. Fokenga.

RAGAN, C.

The Evangelical Lutheran church in the United States is a descendant of the Lutheran church of the sixteenth century,—the first church of the reformation.   It takes its name of Lutheran from the great founder and apostle of Protestantism, and seems to have been called "Evangelical" to distinguish it from the Reformed or Calvinistic Lutherans.   In the United States there are several families of this Lutheran church,—the Dutch Lutherans, the Swedish Lutherans, and the German Lutherans. The organic or fundamental creed of these various branches of the Lutheran church is the Augsburg Confession.   The German Evangelical Lutheran churches in the United States are not all subject to one supreme jurisdiction; that is, no body, council, or conference of German Evangelical Lutherans is invested with the management and general supervision of all the German Evangelical Lutheran congregations in the United States.   The congregations in any particular district or state, such as the congregations in the state of Nebraska, hold annually a synod for such district or state.   This synod is constituted of ordained ministers and licentiates of the various German Evangelical Lutheran congregations in the district.   Just what the jurisdiction of this district synod is does not clearly appear from the record before us, but it seems to be invested with the general supervision and control of the congregations within its district and with authority to determine disputes arising in the various congregations over matters of church discipline and ecclesiastical questions.   There are also held at stated times in the United States certain synods. These synods are composed of delegates chosen from the district or state synods; and while the jurisdiction of this last synod does not clearly appear, it seems to be in the nature of an ecclesiastical court of last resort for the various congregations over which it has jurisdiction. There are in the United States several of these synods,

which we call national to distinguish them from the district or state synods already referred to. For instance, there are, among others, the Missouri, the Iowa, and the general synods. Certain German Evangelical Lutheran congregations attach themselves to and acknowledge the jurisdiction of the Iowa synod, make their contributions for missionary purposes through that synod and accept from that synod their pastors or ministers. Certain other German Evangelical Lutheran congregations subject themselves in like manner to the jurisdiction of the Missouri synod, and certain others of such congregations likewise subject themselves to the jurisdiction of the General synod. But the organic and fundamental creed of all these German Evangelical Lutheran congregations is the Augsburg Confession, no matter whether the congregations acknowledge the jurisdiction of the Iowa or the General synod. The congregations of German Evangelical Lutheran churches subject to the Iowa synod and the congregations subject to the General synod differ in some matters of faith; for instance, the congregations in the Iowa synod practice what is called "close communion,"—that is, these congregations do not permit members of other Christian churches to commune with them, while the congregations subject to the General synod admit all Christians to their communion table. The congregations of the Iowa synod believe in the doctrine of Chiliasm, or that Christ will visibly reign upon the earth for a thousand years, while the congregations of the General synod reject this doctrine. In the matters of church discipline or government the congregations of the Iowa synod will not allow a minister belonging to another synod to officiate, while the congregations acknowledging the jurisdiction of the General synod permit ministers of any synod to act as their pastors. The congregations of the Iowa synod do not permit their members to belong to secret societies, while the congregations of the General synod do not control their members in that respect. (See generally upon the subject

Johnson's Universal Cyclopædia, title "Lutheran Churches in the United States," and Encyclopædia Britannica, title "Lutheranism.")

In February, 1883, there resided in a neighborhood in Johnson county, in this state, a number of Germans professing the Lutheran faith, and at that time there came among these people a preacher or evangelist by the name of Grommish, who was a minister of the General synod of the Evangelical Lutheran church in the United States, and acknowledged the jurisdiction of such synod. This evangelist called together at the residence of one of them a number of these German people, preached to them a sermon, and advised them to organize a congregation. A number of these Germans drew up a writing of that date in which they organized themselves into a religious corporation under the laws of this state, to which they gave the name of "The Evangelical Lutheran St. John's Church of West Sterling, Sterling, Johnson county, Nebraska." This writing or article of association was duly filed in the office of the county clerk of said Johnson county. The congregation elected trustees and called the Rev. Julius Wolf, a minister of the General synod, and made him its pastor. The congregation seems to have flourished for a number of years. It increased its membership. It purchased a small tract of land, and erected thereon a building for church and school purposes, and made contributions to the missionary cause through the General synod. About 1894 the Rev. Wolf, by reason of ill-health and old age, tendered his resignation to this congregation as its pastor, and it was accepted. Thereupon a portion—a majority, it seems—of the congregation desired to select a minister from the Iowa synod. Another portion of the congregation—a minority, it seems—insisted that the pastor should come from the General synod, and over this question the congregation was riven into two factions. The theory of the minority was that the church, as originally founded, was organized and made subject to the jurisdic-

37

tion of the General synod; that the property owned by
the congregation had been donated to it to further not
only the general fundamental organic doctrine of the
Lutheran church, but the peculiar faiths and beliefs and
matters of church polity entertained by the congrega-
tions belonging to the General synod, and that a ma-
jority of the congregation was powerless to transfer this
congregation from the jurisdiction of the General synod
to another, and was without jurisdiction or authority to
select its minister from any jurisdiction except that of
the General synod. The theory of the majority of the
congregation was that the church, as originally organ-
ized and founded, was a free church; that it had, and al-
ways had had, authority to select its minister from any
synod whose congregations were orthodox Lutherans;
that so long as the church property was used to further
the teachings and dissemination of the organic and fun-
damental creed of the Lutheran church it was not being
diverted from the purposes for which it was donated;
and that the congregation, or majority of it, might select
any minister from any of the various synods of the Evan-
gelical Lutheran church in the United States. The mi-
nority party of this congregation, in October, 1894, held
a meeting and adopted what it called a constitution of
the church, in and by which it annexed, or attempted to
formally annex, the congregation to and subject it to
the jurisdiction of the General synod. The majority
party of the congregation also held a meeting, at which
it adopted what is called a constitution for the congre-
gation, declared the church to be a free church, and that
the majority of the congregation had the right to select
its minister from any synod it chose of the various synods
of the Evangelical Lutheran church. Each of these fac-
tions, it seems, elected certain persons, whom it styled
the trustees of the congregation. While things were in
this condition Garrelt Wehmer and others, in behalf of
themselves and the minority of the General synod fac-
tion of the church, brought this suit in equity in the dis-

trict court of Johnson county against Wilm Jannsen Fokenga and others representing the majority faction of this congregation.

Among other things Wehmer and others alleged that the congregation was originally organized and was still subject to the jurisdiction of the General synod; that the parties made defendants and those in sympathy with them were seeking to transfer the jurisdiction of the congregation to the Iowa synod; that they were threatening and about to select as pastor a minister of the Iowa synod; that the parties made defendants had taken forcible possession of the church and church property and had excluded, were excluding, and would continue to exclude Wehmer and others, or the minority faction, therefrom. On the hearing of this case the district court found generally and specially in favor of Wehmer and others; found that the church as originally organized was, and was still, subject to the jurisdiction of the General synod; that Wehmer and others were the legal trustees of the congregation of the church, entitled to the possession, custody, and control of its property; that the Iowa synod of the Lutheran church differed from the General synod of that church in essential matters of government, faith, and belief; that all the acts of the parties defendant hereinbefore stated were illegal; that the majority faction had conspired together to transfer the jurisdiction of the congregation from the General to the Iowa synod; that the majority faction had called in ministers from the Iowa synod to conduct services in the church contrary to the organic law thereof, and had forcibly excluded the minority faction therefrom; and thereupon the court entered a decree restraining the majority faction from keeping the minority faction out of possession of the church property and from selecting a minister for said church from the Iowa synod. From this decree Wilm Jannsen Fokenga and others have appealed.

1. We assume, without deciding, that all the findings

made by the district court are supported by the evidence, and still we think this decree cannot be sustained. The court found that the doctrine and tenets of faith and church polity of the Iowa synod were essentially different from those of the General synod, and on this finding enjoined the majority faction of the congregation from selecting for pastor a minister of the Iowa synod. Whether the religious teachings, faith, and church polity of these synods differed in essential particulars was and is a question for the ecclesiastical tribunals, not the civil courts. It is neither pleaded nor proved that an ecclesiastical tribunal having final jurisdiction to decide this question has determined it in favor of the contention of the appellees; nor is it shown that no such an ecclesiastical tribunal exists having jurisdiction to decide the question. Until such a tribunal—if one exists—shall decide the question, the civil courts will not assume to do so. When some ecclesiastical tribunal having jurisdiction in the premises shall determine that according to the organic law of the church this congregation may or may not subject itself to the jurisdiction of the Iowa synod and select for its pastor a minister of that synod, then the civil courts will recognize this judgment and, if called upon, enforce it. (*Pounder v. Ashe*, 44 Neb. 672.) But it would be an unseemly thing for the secular courts to assume to themselves the right to decide in the first instance whether a certain doctrine or tenet of faith possessed and practiced by one religious organization was contrary to the organic and fundamental doctrines and creed of another religious organization. It may be that because the ministers of the Iowa synod believe in Chiliasm, therefore this congregation would violate the fundamental and organic law of its creation by selecting a minister from the Iowa synod for its pastor; but we think that is a question which the civil courts should not attempt to decide. Suppose a Presbyterian congregation, being without a minister, should by a major vote of all the members of the con-

gregation select for its pastor a Methodist minister. Can it be that the civil courts would enjoin the major part of that Presbyterian congregation at the suit of the minor part of it upon the ground that such action on the part of the majority would violate the organic law of the Presbyterian church? We think not. The remedy of the minority in that case would be the same as it is here,—to appeal to the ecclesiastical tribunals of the Presbyterian church to first determine the question, and if it procured a judgment in its favor, then, if unable to enforce it otherwise, call upon the secular courts for protection.

2. But the district court found that the trustees representing the appellees here were the lawful trustees of the congregation and as such entitled to possession of the church property, and that the appellants were forcibly and wrongfully excluding the appellees therefrom. Assuming all this to be so, it does not follow that the appellees were entitled to the extraordinary remedy of injunction, either to regain possession of this church edifice or to exclude the appellants therefrom. For this relief the appellees had a complete and adequate remedy at law, either by an action in the nature of forcible entry and detainer or by ejectment; and it is neither pleaded nor proved but that either of these remedies would afford the appellees complete and adequate relief. (*Warlier v. Williams*, 53 Neb. 143.)

3. Counsel for the appellees brought this case upon the theory—and the district court seems to have adopted it— that the real estate which belonged to this congregation was donated to it for the purpose of teaching and disseminating, not only the cardinal doctrines of the Lutheran church, the organic creed, to-wit, the Augsburg Confession, but the peculiar tenets of faith, already noticed, held by the congregations of the General synod; and that for this congregation to transfer its allegiance to and become subject to the jurisdiction of the Iowa synod would divert the trust property from the purpose for which it

was donated. We do not think it necessarily follows that if this congregation should transfer its allegiance to the Iowa synod this would be a diversion of the church property from the purposes for which it was donated to the congregation. The deed conveying this property to the congregation or trustees thereof does not recite that it was conveyed to the congregation or the trustees as trust property to be devoted to the teaching and dissemination of the cardinal doctrine of the Lutheran church, much less the peculiar tenets of faith entertained by the congregations of the General or any other synod. Furthermore, no faction of this congregation has threatened or attempted to sell, dispose of, or incumber the church property. The question then as to the power of the majority of this congregation to make a valid sale and conveyance of the congregation's real estate is not presented by this record; and if it was, there is respectable authority for the proposition that the majority of this congregation may sell and dispose of this church property, since its title is not incumbered with an express trust. (*Wilson v. Livingstone*, 58 N. W. Rep. [Mich.] 640; *Schradi v. Dornfeld*, 55 N. W. Rep. [Minn.] 49.) The parties to this suit, if they cannot settle their differences otherwise, must appeal to the ecclesiastical tribunals of their church and have those tribunals determine the rights of these factions according to the organic laws of the church; and when this has been done the civil courts will cheerfully take the judgment of the ecclesiastical tribunal as final in the premises and protect the rights of the congregation as declared by such judgment. (*Watson v. Jones*, 13 Wall. [U. S.] 679; *Pounder v. Ashe*, 44 Neb. 672.) But the courts of the state are but the humble instruments for interpreting human laws which know no heresy, and are committed to the support of no dogma. Religious freedom and religious toleration would not long survive if one member of a religious organization, feeling himself aggrieved in some matter of religious faith or church polity, could successfully appeal to the secular

courts for redress, and have these courts determine that one faction of a religious organization was orthodox, and living and acting in conformity with the organic creed of the church, and another faction was violating and disregarding such organic law. The decree of the district court must be, and is, reversed and the action dismissed.

REVERSED AND DISMISSED.